CABOT CORPORATION *vs.* AVX CORPORATION & another.[1]

Suffolk. January 3, 2007. - March 28, 2007.

Present: GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Contract,* Duress, Ratification. *Duress.*

In a civil action arising out of a multi-year supply contract between the parties, the judge properly granted summary judgment in favor of the plaintiff supplier, where the defendant, a sophisticated and substantial commercial corporation represented by highly competent counsel when negotiating the contract, had no reasonable expectation of proving that it entered into the contract with the plaintiff under economic duress, in that it could not establish that the plaintiff had acted wrongfully in order to coerce the defendant into signing the contract or that the defendant had no feasible alternative in the face of such conduct but to enter into the contract [637-642]; further, the defendant ratified the contract by its actions [642-646].

CIVIL ACTION commenced in the Superior Court Department on March 18, 2003.

The case was heard by *Allan van Gestel,* J., on a motion for summary judgment, and entry of final judgment was ordered by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Joseph S.U. Bodoff* (*Richard A. Goren* with him) for the defendants.

*Robert S. Frank, Jr.* (*Brian A. Davis* with him) for the plaintiff.

CORDY, J. AVX Corporation (AVX) manufactures capacitors for electronic products. Tantalum is an elemental metal, as rare in nature as uranium, used in the manufacture of those products. In January, 2001, AVX entered into a multi-year supply contract with Cabot Corporation (Cabot), a major supplier of tantalum

---

[1] AVX Limited.

powder and wire. In the years immediately preceding the contract, the tantalum market favored buyers, and AVX purchased it from Cabot at preferable prices without entering binding, long-term contracts. When demand for capacitors and the tantalum used in their manufacture increased dramatically in late 2000, Cabot took advantage of what was then a seller's market to negotiate aggressively a multi-year deal. Eighteen months after executing the contract, AVX brought suit in Federal court claiming that it was the product of economic duress. When that suit was dismissed for lack of diversity jurisdiction, Cabot brought suit in the Superior Court seeking, inter alia, a declaration that the contract was valid and binding on the parties. A Superior Court judge granted summary judgment for Cabot, concluding that there was no economic duress where the contract was the product of hard bargaining and not any unlawful or wrongful act, and where the values exchanged between the parties were not disproportionate. The judge also concluded that AVX had, in any event, ratified the contract by its conduct, thereby waiving any claim of duress. AVX appealed and we transferred the case from the Appeals Court on our own motion. We affirm.

1. *Background.* We draw these facts from the undisputed facts in the record. Cabot is a specialty chemicals company, incorporated in Delaware with headquarters in Massachusetts. AVX is also a Delaware corporation and maintains its principal place of business in South Carolina. A majority of its shares are owned by a Japanese conglomerate, Kyocera Corporation. AVX is one of the largest manufacturers and sellers of tantalum capacitors in the world. Both Cabot and AVX are publicly traded corporations and have annual sales of more than one billion dollars.

Tantalum is available in several forms, including wire and numerous grades of powder. The tantalum capacitors that AVX manufactures require the use of various grades of tantalum powder.[2] Cabot is one of three significant producers of tantalum powder. Cabot has its own tantalum mining facility in Canada,

---

[2] Capacitors are passive components used in a wide range of modern electronic devices, including cellular telephones and personal computers. Tantalum is a preferred raw material for high performance electronic capaci-

partially owns some Australian mines, and uses a manufacturing facility in Pennsylvania. By mid-2000, Cabot produced approximately fifty per cent of the world's total processed tantalum. All suppliers of tantalum powder sell nodular powder but only Cabot sells flake powder, which can operate at higher voltages. Cabot holds a patent on the process to make flake powder and AVX uses that powder in certain high performance products, including pacemakers and military technology.

The market for tantalum has been volatile. Periods of high demand, supply shortages, inventory hoarding, and sharply rising prices have been followed by recurring episodes of reduced demand, over production, large customer inventories, and rapidly falling prices. The relative scarcity of tantalum and its historical susceptibility to supply shortages have caused fluctuations in its price to be significantly more pronounced than those of other industrial metals.

AVX has purchased tantalum products from Cabot for many years, and the two companies have worked together to develop new tantalum products and technology. By April, 2000, Cabot was supplying approximately twenty per cent of AVX's total tantalum product requirements. Each year, the parties signed "letters of intent" setting forth estimates of AVX's anticipated tantalum needs and agreed-on prices for each type of product. Cabot maintains that these letters were for planning purposes only, and that, in actual practice, sales deviated from the prices and quantities stated in the documents without protest from Cabot. AVX contends that the documents were binding contracts, entitled "letters of intent" only because they did not establish specific amounts of product that would be purchased, and were akin to "requirements contracts."[3]

In the late 1990's, Cabot attempted to convince AVX to enter

tors because it is extremely resistant to corrosion, is highly ductile, and has a high dielectric constant across a broad range of temperatures. Tantalum capacitors can store electricity in smaller space than capacitors made out of other materials.

[3]A requirements contract is one that measures the quantity of goods to be purchased as "such actual . . . requirements as may occur in good faith." G. L. c. 106, § 2-306 (1). There is no mention in the letters of intent that AVX to purchase its tantalum product "requirements" from Cabot.

into long-term supply or "take or pay" contracts.[4] AVX resisted this alteration to their relationship. In January, 2000, AVX and Cabot signed two letters of intent, one pertaining to tantalum powder and the other to tantalum wire (letters of intent). Each was two pages long and stated that it was "AVX's intention to purchase" particular quantities of specified tantalum powders and wires at stated prices in 2000 and 2001.[5] In the letter pertaining to tantalum powder, which encompassed ten different product grades, there was a "take or pay" provision for one grade of product, C606, requiring AVX to take a specified amount of that product no later than eighteen months after the commencement of "this contract" on February 1, 2000.

Later in 2000, a worldwide shortage of tantalum developed, and demand for electronic products using tantalum capacitors reached unprecedented levels. Orders from some of AVX's customers increased by more than 200 per cent, and AVX announced a dramatic increase in sales over prior years. Supplies of raw tantalum were severely limited. Cabot and other tantalum product manufacturers found it difficult to satisfy the rising demand for tantalum products, resulting in a steep rise in its price throughout the industry. In August, 2000, Cabot notified all of its customers that, in the future, it proposed to commit its limited production capacity to those customers who were prepared to enter into binding, long-term supply contracts.

AVX contends that, in the guise of negotiating a long-term supply contract, Cabot "began a calculated strategy simultaneously (i) to starve AVX of product, and (ii) to issue threats that Cabot would [commit a breach of] the existing short term agreement unless AVX caved into its demands." Between August and November, 2000, Cabot and AVX negotiated the terms of a binding, long-term supply contract. Proposals and counterproposals were exchanged. Both parties were represented by highly competent legal counsel throughout the process. AVX contends that these negotiations "continued in the context of

---

[4]The parties agree that a "take or pay" contract sets forth a mandatory amount of product to be purchased. Even if AVX does not take the product, it must pay for it.

[5]The letters of intent for tantalum powder products set forth prices and amounts intended to be purchased through January 31, 2002; the letters of intent for tantalum wire products applied through January 31, 2001.

Cabot's commercial threats" and points to a communication on September 1, 2000, from a Cabot executive to AVX in which the Cabot executive said that all of the available tantalum powder had been sold as of the previous day. AVX maintains that this statement was false and constituted a threat not to provide any tantalum powder to AVX until a long-term contract was signed.[6]

During the negotiation process, AVX claimed that Cabot was obligated by the letters of intent to continue selling to AVX particular quantities of tantalum powders and wire through January, 2002, and January, 2001, respectively. Cabot took a contrary position. By the end of October, however, AVX offered to waive its claims relating to the letters of intent if the parties could otherwise agree on an acceptable supply relationship.

On November 7, 2000, Cabot and AVX memorialized the terms of a basic agreement to a binding, five-year contract, under which AVX would purchase specified quantities of tantalum powder and wire at stated prices.[7] In an electronic mail message (e-mail) sent to a Cabot executive regarding the agreed terms, the president and chief executive officer of AVX wrote, "I think we have a fair agreement for both parties . . . hope you agree." The prices agreed to were no higher than the then-current market prices for tantalum products.[8] Cabot agreed to AVX's demand of "most favored customer" protection, which meant that if Cabot were to agree in the future to sell to one or more of AVX's competitors at a lower price a grade of tantalum powder or wire comparable to a grade that it was selling to AVX, Cabot would sell the same quantity of that grade to AVX at the lower price. AVX also obtained a right to purchase

[6]As evidence that Cabot was intentionally starving AVX of needed product, AVX points to a shipment of C606 it received in May, 2000, that was 1,200 kilograms short of the agreed amount. However, it is undisputed that Cabot was "shipping [C606] faster than AVX [was] consuming" it at that time. By August, 2000, shipments of C606 were current, while shipments of other powders were "backdue," according to Cabot records.

[7]The supply contract also provided for the sale of tantalum "scrap" from AVX to Cabot.

[8]For example, under the supply agreement, AVX agreed to buy tantalum powder from Cabot at $500 per pound. In late 2000, AVX purchased tantalum powder from one of Cabot's competitors for $500 per pound and agreed to purchase from another competitor at $1,000 per pound.

additional tantalum products in the event that Cabot were to expand its plant capacity. In addition, the parties agreed that the agreement would supersede all prior agreements (including the letters of intent) and released each other from all claims arising thereunder. In November and December, 2000, Cabot and AVX exchanged drafts of a written contract. In January, 2001, they executed the contract (supply contract), effective January 1, 2001.

During the first half of 2001, demand for tantalum products and capacitors remained high. AVX insisted that Cabot make deliveries of tantalum products in strict compliance with the terms of the supply contract. When Cabot fell behind on shipments because of production constraints, AVX pressed Cabot "to catch up on the contract." Cabot agreed, proposed a schedule for future deliveries, and thereafter met the schedule.[9]

Sometime prior to May, 2001, executives at AVX and Cabot began discussing the possibility of making a number of modifications to the supply contract. Those modifications included reducing the quantity and cost of some products that AVX was obligated to take, increasing the amounts of flake powder AVX would be entitled and required to purchase, making changes (sought by AVX) to certain mix restrictions on flake powder products, extending the time for billing and payment, and extending the term of the contract on flake powder by two years. In communications with AVX, Cabot valued its concessions with respect to the principal product on which AVX sought price and quantity reductions at $47.8 million.

These discussions led to an agreement in principle that, in accord with AVX's corporate policy, needed to be submitted to the AVX "executive group" headed by the company's president and chief executive officer for approval. This was done in July, 2001, and the agreement was rejected.[10]

---

[9]Although AVX argues that Cabot was intentionally delaying shipments in 2001 as an exercise of coercion, there is no evidence in the record that supports this contention.

[10]It is not entirely clear why the proposed agreement was rejected. Notes in the possession of Cabot, regarding a conversation with AVX after the rejection, suggested that the AVX chief executive officer wanted the most favored customer provision included in the two-year contract extension period for

Nevertheless, AVX and Cabot continued to negotiate these and other modifications from August through December, 2001.[11] AVX sought additional concessions, as a worldwide decline in demand for computer and telephone products began, reducing the demand for tantalum capacitors. Cabot agreed to some of these concessions, and on December 21, 2001, the vice-president in charge of the tantalum division of AVX recommended to the president and chief executive officer that the negotiated revisions be accepted. In his analysis, the vice-president cited the significant savings that would accrue to AVX in the short term, the advantages it would give AVX over its competitors, and the reality that a long-term relationship with Cabot would be necessary "when the market recovers." The "main downside" he advised was, "will it hinder any future legal position?" The AVX executive group took no action on the recommendation.[12]

Throughout the supply contract's five-year term, both AVX and Cabot performed under its terms. Between January, 2001, and July, 2002, AVX purchased tantalum products worth more than $173 million from Cabot in 469 separate transactions, at the prices and in the amounts specified in the supply contract. By October, 2003, AVX had purchased tantalum products worth more than $342,809,000 in 739 separate transactions under the

flake powder, and was "gambling" on Cabot's not being able to fulfil its first year's obligation under the supply contract. An internal AVX memorandum prepared in May, 2001, regarding its tantalum powder inventories, marked "confidential," recommended that contract renegotiation be deferred until after Cabot made its "September shipments," when AVX could "be comfortable in our inventory position."

[11]During the latter half of 2001, both Cabot and AVX sought and agreed to relief from some of the contract provisions that made little sense in a declining market. For example, in November, 2001, AVX was excused from a requirement that it purchase additional tantalum powder worth $2.5 million by the end of the year, for which it had "absolutely no use," and which would result in "further degradation of our financial health."

[12]In an e-mail dated December 21, 2001, the president and chief executive officer responded to the vice-president's recommendation, advising that the concessions were not sufficient over the long term, and that, "[i]f we now renegotiate and revalidate this contract then we have no possible relief . . . and the clauses in the new contract would further tie our hands . . . we were in a better condition than we thought we were then . . . we need to listen to the lawyer . . . and other avenues for redress before we sell our soul again to this devil."

supply contract.[13] AVX also took advantage of the "most favored customer" provision and availed itself of price reductions aggregating over $6 million.

On July 26, 2002, more than twenty months after the supply contract was negotiated, and more than eighteen months after it was executed, AVX commenced an action against Cabot in Federal court. AVX alleged that the 2000 letters of intent were binding contracts and that the supply contract was void because it had been executed by AVX under economic duress. The action was dismissed for lack of diversity jurisdiction.

Cabot commenced this action in March, 2003, seeking a declaration that the supply contract was a valid and binding contract, and that the 2000 letters of intent were not binding contracts, and were, in any event, superseded by the supply contract, which expressly settled and released all claims relating to them. In its answer, AVX asserted economic duress with regard to the supply contract, and filed various counterclaims, seeking declarations that (1) the 2000 letters of intent were binding contracts; (2) Cabot committed a breach of the 2000 letters of intent; (3) Cabot's knowing disregard of the 2000 letters of intent violated G. L. c. 93A; and (4) Cabot violated the covenant of good faith and fair dealing implied in the 2000 letters of intent when it took "advantage of its market position in the face of a tantalum shortage which it knew was only temporary to coerce AVX into executing" the supply contract. In its answer to the counterclaims, Cabot asserted that AVX had ratified the supply agreement and had released its claims under the letters of intent. Cabot filed a motion for partial summary judgment, which was allowed.[14]

2. *Standard of review.* We review a grant of summary judgment to determine whether, viewing the evidence in the light

[13]During the same period, AVX also sold tantalum scrap worth more than $5 million to Cabot at the prices stated in the supply contract.

[14]The motion related to five of six counts; thus, the decision did not dispose of all claims and counterclaims. The parties then entered into a stipulation of dismissal without prejudice with respect to the unresolved claims and counterclaims, thereby permitting the entry of a final judgment in Cabot's favor. See Mass. R. Civ. P. 58 (a), as amended, 371 Mass. 908 (1977); Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974).

most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law. *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991), citing Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). We may consider any ground supporting the judgment. *Id.*, citing *Champagne* v. *Commissioner of Correction*, 395 Mass. 382, 386 (1985). Where the party opposing the motion bears the burden of proof at trial, the moving party will prevail only if it demonstrates that the nonmoving party has no reasonable expectation of proving an essential element of the case. *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991).

3. *Economic duress.* It is well established that a contract entered into under duress is voidable. *Barnette* v. *Wells Fargo Nev. Nat'l Bank*, 270 U.S. 438, 444 (1926). *Coveney* v. *President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 22 (1983), citing *Avallone* v. *Elizabeth Arden Sales Corp.*, 344 Mass. 556, 561 (1962). *Cappy's, Inc.* v. *Dorgan*, 313 Mass. 170, 174 (1943). *Freeman* v. *Teeling*, 290 Mass. 93, 95 (1935). Restatement (Second) of Contracts § 175 (1981). See 7 A. Corbin, Contracts § 28.1 (rev. ed. 2002); 28 S. Williston, Contracts § 71:3 at 431 (4th ed. 2003) (Williston). Such duress need not be physical; it may be economic in nature. *International Underwater Contrs., Inc.* v. *New England Tel. & Tel. Co.*, 8 Mass. App. Ct. 340, 342 (1979) (*International Underwater Contrs.*), citing *Struck Constr. Co.* v. *United States*, 96 Ct. Cl. 186, 220 (1942). "To show economic duress (1) a party 'must show that he has been the victim of a wrongful or unlawful act or threat, and (2) such act or threat must be one which deprives the victim of his unfettered will,' *International Underwater Contrs.*, *supra*, quoting 13 S. Williston, Contracts § 1617, at 704 (3d ed. 1970), resulting in the threatened party being "compelled to make a disproportionate exchange of values." *International Underwater Contrs.*, *supra*, quoting 13 S. Williston, Contracts, *supra*.

"The elements of economic duress have also been described as follows: '(1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts

of the opposite party.' " *International Underwater Contrs.*, *supra*, quoting *Urban Plumbing & Heating Co.* v. *United States*, 408 F.2d 382, 389 (Ct. Cl. 1969), cert. denied, 398 U.S. 958 (1970). To show duress, a victim "must go beyond the mere showing of a reluctance to accept [and] financial embarrassment" and show that acts of the other party produced these factors. Williston, *supra* at § 71:7 at 449. Thus, "[i]n order to substantiate the allegation of economic duress or business compulsion . . . [t]here must be a showing of acts on the part of the defendant which produced [the financial embarrassment]. The assertion of duress must be proved by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by plaintiff's necessities." *International Underwater Contrs.*, *supra*, quoting *W.R. Grimshaw Co.* v. *Nevil C. Withrow Co.*, 248 F.2d 896, 904 (8th Cir. 1957).

AVX bears the burden of proving that the supply contract it entered into with Cabot was executed under economic duress. *Willett* v. *Herrick*, 258 Mass. 585, 607-608, cert. denied, 275 U.S. 545 (1927). Williston, *supra* at § 71.10 at 460. We agree with the motion judge that AVX has no reasonable expectation of proving the elements necessary to this claim.

AVX and Cabot are sophisticated and substantial commercial parties. They were represented by highly competent counsel in their negotiations of a contract that was to govern their commercial relationship over the long term, and to settle their differences over the validity of prior agreements, purchase orders, and letters of intent. In these circumstances, we will strictly construe the requirements of economic duress against the party asserting it, so as not to undercut the well-established public policy favoring the private settlement of disputes. *Ismert & Assocs. Inc.* v. *New England Mut. Life Ins. Co.*, 801 F.2d 536, 550 (1st Cir. 1986). As the motion judge concluded, "[w]here knowledgeable and fully represented parties choose to embody their relationship in a carefully crafted document, negotiated over several months, they are entitled to and should be held to the language they chose."

There is no dispute that the strength of Cabot's bargaining position in negotiating the supply contract, as well as AVX's weakened position, were the result of a worldwide shortage of

the rare tantalum product, at a time when AVX was facing a rapidly growing demand from its customers for the type of capacitors it manufactured. Cabot did not create the situation — it merely took advantage of it.

The parties also acknowledge, as they must, that it is not infrequent that "when two commercial parties enter into an agreement, one of them has a decided economic advantage over the other," and that "[t]he weaker party often must often enter into the bargain because of his economic circumstances, a disparity in bargaining power to his disadvantage, or some combination of the two." *VKK Corp.* v. *National Football League*, 244 F.3d 114, 123 (2d Cir. 2001). "Because an element of economic duress is thus present when many contracts are formed or releases given, the ability of a party to disown his obligations under a contract or release on that basis is reserved for extreme and extraordinary cases." *Id.* Hard bargaining is not unlawful; it is "not only acceptable, but indeed, desirable, in our economic system, and should not be discouraged by the courts." 13 S. Williston, *supra* at § 71.7, at 450.

Absent any legally cognizable restraint, Cabot was free to drive whatever bargain the market would bear. AVX contends, however, that Cabot did not just engage in hard bargaining, it acted wrongfully in threatening to withhold tantalum deliveries to AVX in violation of the terms of the letters of intent, in order to coerce AVX into signing the supply contract. *David Nassif Assocs.* v. *United States*, 644 F.2d 4, 12 (Ct. Cl. 1981) (threats that would constitute breach of duty of good faith under contract may constitute economic duress). *805 Third Ave. Co.* v. *M.W. Realty Assocs.*, 58 N.Y.2d 447, 451 (1983) (economic duress may be shown if one party has threatened to commit breach of agreement by withholding performance unless other party agrees to further demand). Restatement (Second) of Contracts § 176 (1) (d) & comment e (1981) (threat not to perform under contract may be improper if it amounts to breach of duty of good faith and fair dealing). Of course, if the letters of intent were not binding contracts, it would not have been wrongful for Cabot to have declined to abide by them. Nor would it have been wrongful (in the sense of economic duress) if "there [was] a good faith belief by [Cabot] that its position represent[ed] a plausible one" under

the letters of intent. *Happ* v. *Corning, Inc.*, 466 F.3d 41, 45 (1st Cir. 2006).

The letters of intent are unambiguous and where language is unambiguous, its interpretation is a question of law that may be resolved on a motion for summary judgment. *Seaco Ins. Co.* v. *Barbosa*, 435 Mass. 772, 779 (2002), and cases cited. The language in the letters of intent that "[i]t is AVX's intention to purchase the following materials" is not a binding commitment by AVX to make any purchases at all. See *Schwanbeck* v. *Federal-Mogul Corp.*, 412 Mass. 703, 706-707 (1992). With one exception, no other language in the letters alters their nonbinding nature. In the tantalum powder letter of intent, one of the ten products covered by its terms is dealt with separately from the others. Specifically, as to product C606, "AVX agrees to take or pay for a minimum of 26,494 [kilograms] of C606" (at a set price). This was a binding commitment. There is, however, no evidence in the record that Cabot threatened to withhold this product in the fall of 2000 in an attempt to coerce AVX into signing the supply contract. Just as there was no binding commitment on AVX to purchase products other than C606, Cabot was not bound by the letters to supply any other product in any specific amount. This interpretation is in line with the long-established principle that a "contract" to purchase an unspecified amount of goods is not a contract at all. See, e.g., *Gill* v. *Richmond Coop. Ass'n*, 309 Mass. 73, 79-80 (1941) (no contract where buyers "promised nothing except to buy such milk as they might order" because buyers did not bind themselves to any actual purchase). Cf. *Rhode Island Hosp. Trust Nat'l Bank* v. *Varadian*, 419 Mass. 841, 850 (1995), quoting *Schwanbeck* v. *Federal-Mogul Corp.*, *supra* at 706 ("promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract"); *Schwanbeck* v. *Federal-Mogul Corp.*, *supra* at 706-707 (parties not bound to further negotiations where letter of intent included certain contractual commitments and separate statement of "[i]ntention to proceed to negotiate"); *Stewart* v. *Johnson*, 252 Mass. 287, 290 (1925) (statements that "it is my expectation to take advantage of the panic prices" and "when the proper time comes, will buy for you" did not constitute

binding obligation to make purchases for party to whom statements made). AVX points to no authority for its contention that the letters of intent, as drafted and executed, are binding contracts. It merely asserts that they are.

The deposition testimony of AVX employees as to their understanding and use of the letters of intent is consistent with the conclusion that they were not binding. One AVX employee who routinely submitted purchase orders to Cabot testified that his understanding of the agreements was that they were flexible so that if AVX's tantalum needs changed, it "was not required to actually purchase the specific products or the specific quantities set forth" in the letters and that the quantities set forth in the agreements were "listed for reference for planning purposes [and were] not binding." The AVX materials manager similarly testified that, while he understood the prices set forth were binding, the quantities were not. He further understood that nothing was binding on AVX until it gave a specific order and that order was confirmed by Cabot.[15,16]

In addition to establishing that Cabot acted wrongfully in order to coerce AVX into signing the supply contract, AVX must also prove that it had no feasible alternative in the face of this wrongful conduct but to enter into the supply contract. Leaving aside the question whether AVX could have bought tantalum product from other suppliers, "[c]ourts have consis-

[15]Even if the language of the letters of intent could be viewed as ambiguous, the history of their use as evidenced in the record makes it far from unreasonable for Cabot to take the position, in good faith, that they were not binding. See *Happ* v. *Corning, Inc.*, 466 F.3d 41, 44-45 (1st Cir. 2006). By June of 2000, Cabot officials had also sought and obtained a legal opinion that based on the history of their past use the letters of intent were not binding contracts.

[16]AVX also claims that Cabot engaged in a "pattern and practice that violated commercial norms of conduct" and points to deposition testimony by a representative of another tantalum products purchaser, to the effect that Cabot had forced it to accept a new contract to avoid suffering disastrous commercial consequences. But merely arguing that Cabot "intentionally gained market power with the purpose and intent of exercising leverage against its customers" does not show that Cabot's conduct went beyond hard bargaining in a market that had turned favorable to Cabot. See *Strickland Tower Maintenance, Inc.* v. *AT&T Communications, Inc.*, 128 F.3d 1422, 1426 (10th Cir. 1997) (party cannot establish claim of economic duress "by alleging merely that the opposing party took advantage of [a] weak negotiating position").

tently held that the presence of an adequate legal remedy undermines claims of economic duress." *Ismert & Assocs., Inc.* v. *New England Mut. Life Ins. Co.*, 801 F.2d 536, 549 (1st Cir. 1986) (Breyer, J., concurring), and cases cited. If AVX believed that Cabot was threatening to commit a breach of a binding contract by withholding a scarce product critical to its business in order to coerce a disproportionate bargain, AVX could have gone immediately to court and sought preliminary injunctive relief followed by declaratory relief on the merits of its claim. While "recourse to courts of law" may not be an adequate remedy if it is "not quick enough to save the victim's business or property interests," *International Underwater Contrs.*, *supra* at 346, quoting 13 S. Williston, Contracts § 1617 at 709 (3d ed. 1970), that is not the case here. As the motion judge found, such relief is ordinarily granted, if meritorious, within ten days of the filing of a complaint in State or Federal court. In contrast, the negotiations prompted by Cabot's threats took almost four months to complete.[17]

4. *Ratification.* Even if we were to conclude that, for purposes of summary judgment, material facts regarding the existence of economic duress remain in dispute, Cabot nonetheless would be entitled to summary judgment because the undisputed material facts establish that AVX ratified the contract by its actions.

A contract that is voidable for duress may be ratified and affirmed. *Ford* v. *Retirement Bd. of Lawrence*, 315 Mass. 492, 496 (1944), and cases cited. 7 A. Corbin, Contracts § 28.8 at 59 (rev. ed. 2002). "The subsequent conduct of one who seeks to set aside a transaction voidable on account of fraud or duress bars him from relief if such conduct amounts to a waiver or affirmance of the transaction." *Ford* v. *Retirement Bd. of Lawrence*, *supra* at 496. A party must complain promptly of coercive acts that allegedly forced it into the contract or the

---

[17]While we do not base our conclusion that AVX cannot reasonably expect to establish economic duress on the motion judge's finding that there was no disproportionate exchange of value, that finding finds strong support in the record. Even though AVX may have preferred to order and buy tantalum products on a year-to-year basis, the supply contract provided it with a long-term supply of an exceedingly rare product (in an admittedly volatile market) necessary to its manufacturing business, at then market prices, with a most favored customer clause to protect it against its competitors.

defense of duress is waived, and the contract ratified. *Beacons-field Townhouse Condominium Trust* v. *Zussman*, 49 Mass. App. Ct. 757, 763 (2000). "The requirement that the party claiming duress disclaim the contract or release about which he is complaining promptly or be held to have forfeited his right to do so protects the stability and reliability of such agreements by denying the weaker party the 'heads I win, tails you lose' option of waiting to see how the arrangement works out and then deciding whether to seek to undo it. Under this rule, shortly after the execution of a contract or release, the rights and duties under it become free of the doubt engendered by possible assertions of duress." *VKK Corp.* v. *National Football League*, 244 F.3d 114, 123 (2d Cir. 2001).[18]

As ratification is an affirmative defense to AVX's claim of economic duress, Cabot bears the burden to show that AVX ratified the contract. *Rydman* v. *Dennison Mfg. Co.*, 373 Mass. 855 (1977). See *Abbadessa* v. *Moore Business Forms, Inc.*, 987 F.2d 18, 24 (1st Cir. 1993) (alleged coercing party having provided evidence of ratification, issue is whether alleged victims of economic duress "raised genuine issues of material fact that the claimed duress had not been removed between the time they signed the agreements and the time they brought this action").

"A party may ratify an agreement entered into under duress in a number of different ways: 'first, by intentionally accepting benefits under the contract; second, by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it; and third, by recognizing its validity . . . by acting upon it, performing under it, or by affirmatively acknowledging it.' " *In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir. 1989), quoting *United States* v. *McBride*, 571 F. Supp. 596, 613 (S.D. Tex. 1983). See *Beaconsfield Townhouse Condominium Trust, supra,* and cases cited; *Deren* v.

---

[18]The requirement of prompt disavowal is not unfair to the disadvantaged party who will ordinarily know (as AVX claims to have known) that it was forced to execute the contract under economic duress. With such knowledge, the party "will therefore be able to disclaim the instrument immediately if he was forced into it by economic duress and wishes to avoid its effect." *VKK Corp.* v. *National Football League*, 244 F.3d 114, 124 (2d Cir. 2001).

*Digital Equip. Corp.*, 61 F.3d 1, 2-3 (1st Cir. 1995), and cases cited.

The supply agreement was executed in January, 2001, and the first time AVX asserted duress was in July, 2002. The "burden of avoiding a contractual obligation on the ground of duress 'necessarily increases proportionately with the delay in initiating suit.' " *Ismert & Assocs., Inc.* v. *New England Mut. Life Ins. Co.*, 801 F.2d 536, 550 (1st Cir. 1986) (Breyer, J., concurring), quoting *International Halliwell Mines, Ltd.* v. *Continental Copper & Steel Indus., Inc.*, 544 F.2d 105, 108 (2d Cir. 1976). Eighteen months is an exceptionally long time for a sophisticated party such as AVX, represented by counsel, to wait before voicing a claim of duress. See *Abbadessa* v. *Moore Business Forms, Inc., supra* at 24 (summary judgment appropriate where allegedly coerced individuals waited four and seven months to assert claim of duress and accepted benefits under the agreement); *In re Boston Shipyard Corp.*, 886 F.2d 451, 455 (1st Cir. 1989) (allegation of duress eighteen months after signing modification agreement not reasonable time where purported victim worked with pressuring party for nearly three months); *Dorn* v. *Astra USA*, 975 F. Supp. 388, 393-394 (D. Mass. 1997) (duress defense waived where party to contract waited eleven months to allege duress and accepted benefits under contract). AVX claims, however, that it was subject to Cabot's coercive tactics until the negotiations to modify the contract failed at the end of 2001, and that it could not risk alleging duress while still subject to that coercion. Thus, it argues, when it filed suit alleging duress in July, 2002, the delay was six or seven months, and not eighteen months.

The record viewed in its light most favorable to AVX leaves little doubt that whatever coercion AVX believed it was subject to during the last half of 2000, and the first half of 2001, it was fully capable of exercising its "free will and judgment" with regard to the contract by July, 2001, when it rejected modifications negotiated by its management and agreed to by Cabot. *Coveney* v. *President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 22 (1983), quoting *Avallone* v. *Elizabeth Arden Sales Corp.*, 344 Mass. 556, 561 (1962) (duress is such fear as precludes exercise of "free will and judgment"). Yet

another twelve months elapsed before AVX raised its claim of duress. This lengthy period of silence is powerful (if not conclusive) evidence of ratification.

Ratification is further evidenced by AVX's performance under the contract. During 2001, while the market for electronic capacitors remained strong, AVX accepted the benefits afforded it under the terms of the supply contract, purchased Cabot's tantalum products necessary to its manufacture of capacitors, and demanded that Cabot deliver those products in the quantities and in the time frames specified therein.

AVX contends, however, that the purchases it made in 2001 were pursuant to the preexisting letters of intent and not the supply contract. There is no evidence in the record to support this contention.[19] It is uncontested that AVX paid for tantalum products during 2001 at the rates established in the supply contract, and not in the letters of intent. In addition, of course, AVX continued to purchase tantalum under the supply contract after the letters of intent would have expired, in January, 2001 (wire), and January, 2002 (powder), and for the remainder of its term.

AVX finally argues that ratification of the supply contract was only possible once it formed an intent to ratify, an intent it claims it never formed. While an intention to ratify is "an essential element and is at the foundation of the doctrine of waiver or ratification," it may be shown by "conduct inconsistent with any other hypothesis than that of approval." Annot., Ratification of Contract Voidable for Duress, 77 A.L.R.2d 426, 434 (1961). AVX's continued purchase of tantalum products worth hundreds of millions of dollars and its sale of scrap under the terms of the supply contract, its assertion of its right to the full and timely delivery of the products under the contract beginning early in its term, and its subsequent assertion of the most favored customer protections of the contract later on is conduct inconsistent with any conclusion other than an intention to

---

[19]To the contrary, for example, in a May, 2001, letter, one division of AVX complained of "accumulating tantalum powder inventory" because of reduced demand and the "take or pay" contract with Cabot. The 2000 letters of intent, however, included a take or pay provision for only one type of powder (C606), not the type identified in the May, 2001, letter.

ratify. *Rosenbloom* v. *Kaplan*, 273 Mass. 411, 417 (1930) ("must be assumed" payments made pursuant to mortgage "were made with an intention to affirm the contracts and obligations thereunder").

AVX cannot simply accept the terms of a supply contract favorable to it, obtain the supply it needs, and claim it did not intend to ratify the contract because some terms were unfavorable to it. Stated otherwise, it cannot "wait[] to see how the arrangement works out and then decid[e] whether to seek to undo it." *VKK Corp.* v. *National Football League*, 244 F.3d 114, 123 (2d Cir. 2001). See *Deren* v. *Digital Equip. Corp.*, 61 F.3d 1, 3 (1st Cir. 1995) (former employees ratified agreement by accepting payments under terms of contract for three and one-half years before alleging duress). See *Ford* v. *Retirement Bd. of Lawrence*, 315 Mass. 492 (1944) (following alleged coercion, employees assented to continued payroll deductions by failing to contest after threats expired, waiving defense of duress); *Rosenbloom* v. *Kaplan, supra* (mortgage note allegedly executed under duress not voidable where mortgagor made payments of interest on note after alleged acts causing duress had ceased). See also *In re Boston Shipyard Corp., supra* at 455 (purported duress victim who signed modification in exchange for payment, worked for nearly three months with coercing party, and waited over eighteen months after signing modification to allege duress ratified modification and waived duress defense).

5. *Conclusion.* Summary judgment was properly granted for Cabot. The supply agreement is not voidable for economic duress. Consequently, the release it contains is enforceable. Cabot and AVX have released each other from "any and all claims and causes of action relating to, or arising under, the Prior Agreements." Cabot is entitled to judgment as a matter of law.

*Judgment affirmed.*